UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED:  9/27/13
```

——————————————————————X

MARK ANGEL PAGAN,              :

             Plaintiff,       :

      - against -         :

CORRECTIONAL MEDICAL SERVICES and the :
CITIZENS' POLICY AND COMPLAINT    :
REVIEW COUNCIL, DOMINICK ORSINO,   :
JOSEPH RYAN, EDWARD KISTNER, TOM   :
ROOME, BRIAN O'DONOHUE, TERRY     :
HANSON, MARY DELGADO, OLADAYO    :
KEHINDE, CARMAN BURGOS, and FRANCES :
SULLIVAN, in their individual and official   :
capacities,                      :

                       :

            Defendants.     :

——————————————————————X

**OPINION AND ORDER**

11 Civ. 1357 (ER)

     *Pro se* plaintiff Mark Angel Pagan ("Plaintiff" or "Pagan") brings this suit pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his constitutional rights while he was incarcerated at the Orange County Correctional Facility ("OCCF"). Specifically, he claims that Defendants violated his Eighth Amendment rights by delaying surgery on his left knee. In a prior Opinion and Order, dated June 6, 2012, the Court granted motions for summary judgment as to Defendants O'Donohue, Delgado, and Kehinde, and motions to dismiss as to Defendants Sullivan and the Citizens' Policy and Complaint Review Council. Doc. 116. Additionally, the Court granted Plaintiff's motion to amend the Complaint to add Dr. Muhammad Shahid as a Defendant. *Id.* Accordingly, the remaining Defendants in this action are Correctional Medical Services ("CMS"), Orsino, Ryan, Kistner, Roome, Hanson, Burgos, and Shahid (collectively, the "Defendants"). Presently before the Court are the remaining Defendants' motions for summary

judgment on the grounds that Plaintiff's claims are time-barred and lack merit.[1]  Docs. 131, 136.

For the reasons discussed below, Defendants' motions for summary judgment are GRANTED.

## I.    Local Rule 56.1

Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the

Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary

judgment pursuant to Fed. R. Civ. P. 56 must submit a "separate, short and concise statement, in

numbered paragraphs, of the material facts as to which the moving party contends there is no

genuine issue to be tried."  Local R. 56.1(a).  In answering a motion for summary judgment,

litigants in this District are required to specifically respond to the assertion of each purported

undisputed fact by the movant and, if controverting any such fact, to support its position by

citing to admissible evidence in the record.  Local R. 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c)

(requiring reliance on admissible evidence in the record in supporting or controverting a

purported material fact).  If the moving party seeks summary judgment against a *pro se* litigant,

it is also required to notify the *pro se* litigant of the requirements of Fed. R. Civ. P. 56 and Local

Civil Rule 56.1.  Local R. 56.2.  Once served with a statement pursuant to Local Rule 56.2,

"[*p*]*ro se* litigants are then not excused from meeting the requirements of Local Rule 56.1."  *Wali*

*v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear Co. v. 1-*

*800-BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir. 2004)).

Pursuant to Local Rule 56.1(c), each factual statement set forth in the moving party's

Rule 56.1 statement "will be deemed to be admitted for purposes of this motion unless

specifically controverted by a correspondingly numbered paragraph in the statement required to

---

[1] Defendant Burgos, on the one hand, and Defendants CMS, Orsino, Ryan, Kistner, Roome, Hanson and Shahid, on the other, have separately moved for summary judgment and have submitted two moving briefs.  Because the arguments contained in the two memoranda of law substantially overlap, the Court will address both motions together in this Opinion and Order.

be served by the opposing party."  Local R. 56.1(c); *see also T.Y. v. NYC Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S. Ct. 3277 (2010).  However, "where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wali,* 678 F. Supp. 2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001)).

Here, Defendants filed and served statements pursuant to Local Rule 56.1, setting forth the undisputed material facts with citations to admissible evidence in the record.  Docs. 134, 150. In addition, Defendants duly served and filed a statement pursuant to Local Rule 56.2, apprising Plaintiff of the potential consequences of not responding to the motion as required by the Local Rules.[2]  Docs. 131, 136.  Plaintiff did not make *any* submissions in opposition to Defendants' motions for summary judgment, even after the Court granted him four extensions of time within which to do so.  Docs. 158-161.

Ordinarily, a failure to respond to facts set forth in the movant's Rule 56.1 statement results in those facts being deemed admitted.  *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003).  As the Second Circuit has emphasized, however, *pro se* litigants are entitled to "special solicitude . . . when confronted with motions for summary judgment."  *Graham v.*

---

[2] The Court notes, however, that Defendants' notices pursuant to Local Rule 56.2 are deficient in two minor respects.  First, Rule 56.2 states that a moving party shall file "*as a separate document*" the form "Notice to Pro Se Litigant who Opposes a Motion for Summary Judgment" with the full texts of Fed. R. Civ. P. 56 and Local Rule 56.1 attached.  Local R. 56.2 (emphasis added).  Here, Defendants did not file the notice as a separate document, but rather as part of their Notice of Motion.  Additionally, although Defendants attached the full text of Rule 56, they did not attach a copy of Local Rule 56.1.  Nevertheless, the Court finds that the notice included in Defendants' submissions adequately apprised Plaintiff of his obligations in responding to their motions for summary judgment.

3

*Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988)).  Accordingly, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in the complaint and to determine if there are any other material issues of fact based on the evidence in the record.  *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).  The Court has considered the present motions in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled.  *Burke v. Royal Ins. Co.*, 39 F. Supp. 2d 251, 257 (E.D.N.Y. 1999).

## II.    Background

Plaintiff was incarcerated at OCCF from September 16, 2004 to May 27, 2005 and again from December 18, 2007 to July 16, 2008.  Third Amended Complaint ("TAC") (Doc. 119) ¶¶ 2, 23.

### a.    First Incarceration at OCCF

Plaintiff claims that upon arrival for intake at OCCF on September 16, 2004, he informed medical staff that he was suffering from an injury to his left knee and that over the course of his incarceration at OCCF, he submitted "countless sick call slips" requesting medical care for his injury.  *Id.* ¶¶ 1, 3.  The pertinent medical records relating to the treatment Plaintiff received for his knee while incarcerated at OCCF are as follows:

- September 26, 2004:  Plaintiff notified a nurse at OCCF that he injured his knee playing basketball and that he could not walk, and requested that he be sent to main medical for an emergency sick call.  The nurse then directed a corrections officer to pick Plaintiff up in a wheelchair, however, Plaintiff refused to go.  Supplemental Affidavit of Donald P. Ford, Jr. ("Ford Supp. Aff.") (Doc. 138), Ex. 3.

- September 28, 2004:  Plaintiff complained of knee pain and indicated that his knee had been swollen for three days.  Examination revealed positive range of motion with discomfort, positive ambulation, positive pedal pulses, no ankle swelling, and complaint of constant twisting of ankle due to foot wear.  Plaintiff was given ankle support, instructed to keep leg elevated, and ordered to take Motrin 400 mg for five days.  An x-ray was scheduled for the following day, and Plaintiff was scheduled to see the doctor on October 5, 2004.  Ford Supp. Aff., Ex. 4.

- September 29, 2004:  Plaintiff's knee was x-rayed.  The x-ray report indicated no fracture or dislocation.  Ford Supp. Aff., Ex. 1.

- October 1, 2004:  Plaintiff was observed walking without obvious discomfort or distress while in shackles, and had not been showing up to receive pain medication as prescribed.  Ford Supp. Aff., Ex. 4.

- October 4, 2004:  Plaintiff had been seen on multiple occasions yet continued to submit nurse sick call slips saying that he had not been seen. Plaintiff was seen by the medical supervisor, his knee was x-rayed and a medical appointment was made.  Plaintiff had been consistently observed walking without obvious discomfort, playing basketball, and had not been showing up for pain medication as ordered.  Ford Supp. Aff., Ex. 5.

On October 6, 2004, Defendant Burgos, a nurse practitioner at OCCF, conducted a medical assessment of Plaintiff.  Affidavit of Carmen Burgos (Doc. 133) ("Burgos Aff.") ¶ 4 and attached exhibit.  The assessment noted that Plaintiff's left knee was x-rayed on September 29, 2004 and that the x-ray revealed no fracture or dislocation.  *Id.*  Burgos also documented slight left knee tenderness on palpitation without effusion, and that Plaintiff's left knee range of motion was intact (i.e., Plaintiff had range of motion in all directions of his left knee).  *Id.*  She further noted that Plaintiff attributed his left knee pain to a lack of shoe support.  *Id.*  Accordingly, that same day, Burgos sent a "speedy reply message" to Defendant Captain Joseph Ryan ("Defendant Ryan"), stating that Plaintiff requested use of his own sneakers due to lack of shoe support resulting in left knee pain.  *Id.*  Burgos also ordered Plaintiff to take Naproxen 550 mg twice a day for two weeks, and to wear an elastic band on his left knee for two weeks.  *Id.*; *see also* Ford Supp. Aff., Ex. 6 (10/6/04 Physician's Order).

On March 13, 2005, Plaintiff filed a grievance complaining of an alleged failure to transport him to an outside facility for an examination of his knee.  Affidavit of Lawrence Schott ("Schott Aff.") (Doc. 142), Ex. E (the "2005 Grievance").  Defendant Schott, the Grievance Coordinator at OCCF at the time, investigated the grievance.  Schott Aff. ¶¶ 2, 6.  Schott's Investigation Report, dated March 15, 2005, states under the heading "Summary of Findings":

> Inmate Pagan has assaulted several officers within the facility and outside the facility.  He has escaped from a court appearance and has made remarks about escaping when on an outside doctors [sic] appointment.  He has also shown the ability to remove handcuffs and body belts.
>
> On 3/7/05 he removed the handcuffs from one of his hands while in the housing unit and violently resisted the officers whom [sic] attempted to re-secure his hands.  One of the officers did receive injuries.
>
> On 3/9/05 he removed his waist belt that secured the handcuffs and assaulted Sgt. Schindler.  Sgt. Schindler received an injury to his ankle.
>
> Due to inmate Pagans [sic] behavior on 3/7 and 3/9/05, his appointment with an outside doctor was postponed.

Schott Aff., Ex. F.  The Report continues:  "The medical department within the facility will continue to provide for inmate Pagans [sic] medical needs.  Inmate Pagans [sic] restrictions will be reviewed every 7 days by Capt. Ryan. . . . . When [Pagan's] behavior can allow for a safe transport, another appointment will be made with the outside doctor."  *Id.*; *see also id.* Exs. G, H. The record reveals that the decision to cancel Plaintiff's outside medical appointment was made by Defendant Ryan, Security Captain at OCCF.  *See* Schott Aff., Exs. G, H; Affidavit of Joseph Ryan ("Ryan Aff.") (Doc. 139) ¶ 12.

The Corrections Administrator at OCCF, Defendant Orsino, concurred with the Grievance Report and denied the grievance on March 17, 2005.  Affidavit of Dominic Orsino

6

("Orsino Aff.") (Doc. 144), Ex. H; *see also id.* ¶¶ 1, 7-8.  As part of his review of the grievance, Orsino spoke to the jail physician, who indicated that Plaintiff could be appropriately treated for his knee complaints without creating the security concerns presented by an outside medical appointment.  *Id.* ¶ 7.  Thereafter, on April 19, 2005, the Citizens' Policy and Complaint Review Council denied Plaintiff's grievance.  Schott Aff., Ex. L.  The denial noted, however, that although security is a "paramount concern," the "health and wellbeing of an inmate should not be compromised," and that as it appeared that the physician was not consulted prior to the decision to cancel the outside appointment, "it is recommended that the physician be advised of any need to cancel a trip for security reasons, to assure that the delay will not adversely affect the inmate's health and wellbeing."  *Id.*

**b.  Incarceration at Downstate Correctional Facility**

On May 27, 2005, Plaintiff was transferred to Downstate Correctional Facility ("DCF"). TAC ¶ 10.  Plaintiff alleges that during his approximately two-month stay at DCF, he was seen by several nurses as well as the facility physician on numerous occasions, but was only administered anti-inflammatories and was told that because DCF is a reception facility, he would have to wait until he was transferred to his permanent facility before he could be seen by an orthopedic specialist.  *Id.* ¶ 11.

**c.  Incarceration at Elmira Correctional Facility**

On July 29, 2005, Plaintiff was transferred to Elmira Correctional Facility ("ECF"), where he remained until May 17, 2007.  *Id.* ¶¶ 12, 16.  Plaintiff alleges that while he was at ECF, his knee "remained swollen and unstable" leaving him in pain and forcing him to "routinely be seen by medical staff."  *Id.* ¶ 12.  On November 9, 2005, while at ECF, Plaintiff had an MRI of his injured knee, which indicated that he had a tear of the meniscus.  Ford Supp. Aff., Ex. 7.  On

7

November 14, 2005, Plaintiff had a medical consultation with Dr. William Kelly, during which Plaintiff's MRI report was discussed. Ford Supp. Aff., Ex. 8. The progress notes from the consultation indicate that Plaintiff would rather try physical therapy before considering an orthopedic consult, and that he had "no pain in knee at present time." *Id.* The record indicates that Plaintiff began receiving physical therapy on November 29, 2005 from Five Points Physical Therapy. Ford Supp. Aff., Ex. 10. It is undisputed that Plaintiff did not have knee surgery while incarcerated at ECF. TAC ¶¶ 12-16.

### d. Incarceration at Attica Correctional Facility

Plaintiff was transferred to Attica Correctional Facility ("ACF") on May 17, 2007, where he remained until December 17, 2007. TAC ¶ 16. Plaintiff alleges that he was seen by medical personnel on "numerous occasions" for pain and swelling in his left knee throughout his incarceration at ACF. *Id.* ¶ 17. On August 24, 2007, Plaintiff was directed to complete physical therapy for his knee per the orders of Dr. Coniglio, an orthopedic specialist who had examined Plaintiff while he was incarcerated at ECF. Ford Supp. Aff., Exs. 14, 17; *see also* TAC ¶ 18. Plaintiff's first physical therapy appointment was on September 10, 2007. Ford Supp. Aff., Ex. 18; *see also* TAC ¶ 18. The physical therapist's notes from that appointment indicate that Plaintiff stated: "I don't want the surgery." Ford Supp. Aff., Ex. 18.

Plaintiff alleges that on September 18, 2007, his sentence was vacated and he was remitted back to OCCF for further proceedings. TAC ¶ 19. However, Plaintiff remained at ACF for the next 90 days "and continued his physical therapy sessions as ordered by . . . Dr. Coniglio." *Id.* Plaintiff's medical records indicate that on November 9, 2007, he reported to the physical therapist that he was "somewhat better," but that he still "get[s] a feeling that [his] knee locks up and [he] can't straighten it all the way." Ford Supp. Aff., Ex. 18. On November 21,

2007, Plaintiff told his physical therapist that his knee was "locking" and that he "want[s] to have the surgery to fix it since [physical therapy] hasn't helped to [sic] much." *Id.* Plaintiff was then referred back to medical for further evaluation and intervention. *Id.* According to Plaintiff, however, the medical "evaluation and intervention" did not occur because he was remanded back to OCCF on December 18, 2007. TAC ¶¶ 21-22.

### e. Second Incarceration at OCCF

Plaintiff was incarcerated at OCCF from December 18, 2007 through July 16, 2008. *Id.* ¶ 23. Plaintiff's medical records indicate that during his second incarceration at OCCF, his knee issues were addressed as follows:

- December 18, 2007: Defendant Burgos performed a Jail Health Assessment of Plaintiff. Affidavit of Terry Hanson ("Hanson Aff.") (Doc. 147), Ex. B; *see also id.* ¶ 7. Burgos' bilateral examination of Plaintiff's knee revealed full range of motion, non-tenderness, no erythematous (redness), and ambulation without difficulty. *Id.* The records indicate that there was a follow-up evaluation by Burgos on December 27, 2007. *Id.*

- January 9, 2008: Plaintiff attended nurse sick call and was referred to the nurse practitioner for review. Hanson Aff., Ex. F at F3. Plaintiff also provided Defendant Hanson, CMS Director of Nursing, with his MRI report. Hanson Aff., Ex. D; *see also id.* ¶¶ 2, 8(b).

- January 26, 2008: Plaintiff refused nurse sick call. Hanson Aff., Ex. F at F5.

- January 28, 2008: Plaintiff was seen in nurse sick call and referred to doctor sick call. *Id.* at F6.
- February 1, 2008: Plaintiff was evaluated by Dr. Sharfudin, one of the jail physicians, who noted Plaintiff's knee pain in his records and submitted a Consultation Request directing that Plaintiff be examined by an orthopedist. Hanson Aff. ¶ 8(c); *see also id.* at Exs. C, E; Affidavit of Thomas Roome ("Roome Aff.") (Doc. 146), Ex. E. According to Defendant Roome, the Health Services Administrator at OCCF, the orthopedic consultations were completed by the orthopedist that visits OCCF on a periodic basis. Roome Aff. ¶ 10.

- February 11, 2008: Dr. Sharfudin ordered that Plaintiff be put on bed rest pending the orthopedic consultation. Hanson Aff., Ex. E; *see also id.* ¶ 8(d).

- February 13, 2008:  Defendant Hanson noted in Plaintiff's records that Plaintiff was "up walking around playing games with other inmates" and was "not adhering to [doctor's] orders of bed rest."  Ms. Hanson noted that Plaintiff was to be moved to medical and continue on bed rest until evaluated by a doctor.  Hanson Aff., Ex. C; *see also id.* ¶ 8(e).

- February 15, 2008:  Defendant Hanson noted that Plaintiff was assessed in "main medical," that his bed rest was evaluated and that he was permitted to come out and watch television with the other inmates.  Hanson Aff., Ex. C.

On February 18, 2008, Plaintiff filed a grievance alleging that the medical staff at OCCF denied him proper medical care for his knee and consistently refused his requests for surgery (the "2008 Grievance").  Hanson Aff., Ex. A; *see also* TAC ¶ 28.  The grievance requested that Plaintiff be seen by an orthopedic specialist immediately and be allowed to have the necessary surgery.  *Id.*  Plaintiff's grievance was investigated by Defendants Hanson and Roome, who met with Plaintiff on February 19, 2008 to review the grievance and attempt a resolution.  Hanson Aff. ¶ 13; *see also id.* at Ex. H.  According to the Grievance Investigation Form, dated February 22, 2008 and prepared by Defendant Sergeant Edward Kistner ("Defendant Kistner"), the investigating Grievance Coordinator, during their meeting with Plaintiff, Roome and Hanson explained the treatment plan and advised Plaintiff of the scheduled appointment with the orthopedic doctor.  Hanson Aff., Ex. H.  Plaintiff advised that he was satisfied with that arrangement, but did not withdraw the grievance.  *Id.*  The Investigation Form listed the dates of Plaintiff's treatments, and concluded that the grievance was "unfounded," as Plaintiff "has been correctly treated on an ongoing basis for his preexisting knee problem" and had been scheduled for consultation with an orthopedist.  *Id.*  On March 3, 2008, Major Thomas Madden, a designee of the Chief Administrator Officer, affirmed Defendant Kistner's findings, and on April 10, 2008, the Citizens' Policy and Complaint Review Counsel voted to deny the grievance.  Affidavit of Edward Kistner ("Kistner Aff.") (Doc. 143) ¶¶ 12-13; *see also id.* at Exs. I, J.

10

Plaintiff was subsequently examined by an orthopedist, Dr. Marc Appel, on March 4, 2008.  Hanson Aff., Ex. I.  Dr. Appel's notes from that visit indicate that Plaintiff "did not want surgery prior, but at this point would like to try to get back to as much function as possible."  *Id.*  Under the heading "Recommendations," Dr. Appel wrote:  "He requires arthroscopic surgery.  This will be an *elective* anterior cruciate ligament reconstruction with attention directed to his medical meniscus as well. . . . We will see him electively for possible surgery."  *Id.* (emphasis added).  That same day, Defendant Shahid, a medical doctor at OCCF, ordered that Plaintiff was to discontinue bed rest but that he was not permitted to engage in physical recreation.  Affidavit of Muhammad Shahid, MD ("Shahid Aff.") (Doc. 145), Ex. C.

Thereafter, on April 6, 2008, Plaintiff was seen by Defendant Hanson, whose notes indicate that Plaintiff reported falling on a wet floor, causing him to twist his knee.  Hanson Aff., Ex. J; *see also id.* ¶ 16.  Hanson observed that there was mild swelling to his knee but that his range of motion was intact, and ordered that Plaintiff use crutches.  *Id.*  Hanson's notes also reference an "ortho referral."  *Id.*  Similarly, on April 7 and 9, 2008, Hanson noted that Plaintiff's knee still remained swollen and instructed Plaintiff that he was to be non-weight bearing until cleared by medical.  *Id.*  Plaintiff alleges that during his April 7 appointment with Hanson, in response to statements about his need for surgery on his left knee, Hanson stated that the procedure was an "elective procedure," that they do not do elective procedures at OCCF and that Plaintiff would have to pay for the surgery if he wanted it done.  TAC ¶ 37.  When Plaintiff replied that he was indigent and could not pay for the surgery, Hanson suggested that he contact his mother to see if he was covered under her medical insurance plan.  *Id.*

In response to Plaintiff's fall, Dr. Shahid placed a telephone order directing Plaintiff to take Motrin for seven days and that he be in "medical placement until knee improves."  Shahid

11

Aff. ¶ 9; *see id.* at Ex. C.  In addition, Plaintiff was directed to use a wheelchair for transportation and continue ice and ace wrap.  *Id.*  The same day as Plaintiff's fall, April 6, 2008, a consultation request for an orthopedic evaluation was issued at Dr. Shahid's direction.  Shahid Aff. ¶ 10; *see also id.* at Ex. E.  Under "Presumed Diagnosis," the request states "Re-injury of left knee."  *Id.*  A second consultation request was issued in May 2008.  *Id.*

On April 9, 2008, an x-ray of Plaintiff's left knee was ordered.  Shahid Aff. ¶ 11; *see id.* at Ex. C.  The x-ray was taken the following day, on April 10, 2008, and the x-ray report indicated that there was no evidence of fracture or dislocation.  Shahid Aff. ¶ 11; *see id.* at Ex. F.

On May 4, 2008, Plaintiff was re-examined by Dr. Appel.  Shahid Aff., Ex. G.  Dr. Appel's report of the examination indicates that at that time, Plaintiff had no pain or swelling.  *Id.*  He recommended an "[e]lective reconstructive surgery to [Plaintiff's] anterior cruciate ligament, if he demonstrates functional instability."  *Id.*  Dr. Shahid states in his affidavit that an "elective procedure" means a procedure that does not need to be immediately performed.  Shahid Aff. ¶ 6.[3]  He also notes that Dr. Appel "conditioned the surgery upon a finding of functional instability," but did not make such a finding.[4]  *Id.* ¶ 12.

On July 9, 2008, Dr. Shahid ordered that Plaintiff was to have no recreation and to wear a knee brace.  Burgos Aff. ¶ 11 and attached exhibit.  The following day, July 10, 2008, Burgos sent a "speedy message" to command staff stating that Plaintiff was to continue "no rec" and that a knee brace had been ordered by the physician on July 9.  *Id.* ¶ 10 and accompanying exhibit.

_____

[3] In Paragraph 12 of his affidavit, Dr. Shahid states that an "elective surgery" is one that *does* require immediate operation.  Shahid Aff. ¶ 12.  As Dr. Shahid previously indicated that an "elective surgery" is one that need *not* be performed immediately, the Court assumes the statement in Paragraph 12 is a mistake.

[4] Although Plaintiff alleges that on May 18, 2008, Dr. Marie Chiao requested an offsite consultation "for the recommended surgery," TAC ¶ 40, Dr. Chiao states in an affidavit that she has not been employed by CMS in any capacity at OCCF since May 28, 2005 and that she has not treated any inmates at OCCF since that time.  Affidavit of Marie T. Chiao ("Chiao Aff.") (Doc. 148) ¶¶ 3-5.  Dr. Chiao states that the May 18 "Consultation Request" was dated May 18, 2005, not May 18, 2008.  *Id.* ¶ 7.

Burgos states in her affidavit that it was "essential" that Dr. Shahid's orders be communicated to command staff so that Plaintiff would not engage in physical recreation and/or discontinue use of a knee brace in violation of the doctor's orders.  *Id.* ¶ 12.

Dr. Shahid's notes indicate that on July 16, 2008, he spoke to Plaintiff, who stated that he was having no knee pain and wanted to return to recreation.  Shahid Aff. ¶ 13; *see also id.* at Ex. H.  Accordingly, an order was issued permitting Plaintiff to return to recreation.  Shahid Aff. ¶ 13; *see also id.* at Exs. C, I.

### f.   Incarceration at DCF

On July 16, 2008, Plaintiff was transferred back to DCF.[5]  TAC ¶¶ 45-46.  Plaintiff's medical records indicate that he received physical therapy during the period September 30, 2008 through November 26, 2008 while at DCF.  Ford Supp. Aff., Ex. 21.

On December 29, 2008, Plaintiff was examined by Dr. Coniglio, who stated in his report: "[T]he simplest thing to do would be arthroscopy and stabilize the patella at that time.  [Pagan] understands and wants to go ahead with this.  If he needs, he can have the ACL done later on, but I explained to him that would require a lot more rehab, and I think he may not need it.  We will proceed with arthroscopy . . . ."  Ford Supp. Aff., Ex. 20.  On January 27, 2009, Dr. Coniglio performed the arthroscopic surgery on Plaintiff's knee at the Wyoming County Community Hospital.  Ford Supp. Aff., Ex. 22.

---

[5] Plaintiff alleges that he filed a grievance while still at OCCF on July 15, 2008 ("Grievance Number 2008-4425").  TAC ¶ 45.  However, Defendant Kistner, the Grievance Coordinator at OCCF at the relevant time period, states that Plaintiff's grievance was not perfected.  Kistner Aff. ¶ 6.  Although Plaintiff attached Part I of Grievance Number 2008-4425 as an attachment to the Amended Complaint (Doc. 8), Sergeant Kistner states that there is no record of the grievance being submitted for action by Plaintiff.  *Id.*  Such a record of receipt would be recorded on Grievance Form—Part II, an example of which is attached to the Kistner Affidavit as Exhibit I.  Because there is no OCCF staff acknowledgment of receipt of Grievance Number 2008-4425, no action was taken by Defendants with respect to the grievance, which was not perfected.  *Id.*

III.    **Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving

14

party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986)).

## IV.   Statute of Limitations

Defendants move for summary judgment on the basis that Plaintiff's claims against them are time-barred.  In Section 1983 actions, the applicable limitations period is found in the "general or residual state statute of limitations for personal injury actions."  *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (citation and brackets omitted); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law.").  Accordingly, New York's three-year statute of limitations for unspecified personal injury actions, CPLR § 214(5), governs Section 1983 actions in New York.  *Ormiston*, 117 F.3d at 71 (citing *Owens v. Okure*, 488 U.S. 235, 251 (1989)).  The statute of limitations starts running in a Section 1983 case "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Id.* (citation omitted).

Plaintiff filed the initial Complaint on February 16, 2011.[6]  He then filed an Amended Complaint, a Second Amended Complaint, and a Third Amended Complaint.  For purposes of the statute of limitations, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Thus, because the amended complaints assert claims that arose out of the conduct "attempted to be set out" in the initial complaint, New York's statute of limitation would

---

[6] Although the Complaint was not filed by the clerk's office until February 22, 2011, because the Complaint is dated February 16, 2011, the Court accepts that date as the filing date for statute of limitations purposes.  *See Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) ("[A] *pro se* prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials.").

15

bar any § 1983 claim against Defendants based on events prior to February 16, 2008.

The Second Circuit has held that "the continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs." *Shomo*, 579 F.3d at 182.  But the court cautioned:  "That the continuing violation doctrine *can* apply, however, does not mean it must." *Id.* (emphasis in original).  In order "[t]o assert a continuing violation for statute of limitations purposes, the plaintiff must allege both the existence of an ongoing policy of deliberate indifference to his or her serious medical needs and some non-time-barred acts taken in the furtherance of that policy."  *Id.* (citation and brackets omitted).  Thus, for the doctrine to apply to a particular defendant, the plaintiff must show that that particular defendant "committed at least one wrongful act within the statutory time period."  *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 350 (S.D.N.Y. 2009).

### i.  Plaintiff's Claims Against Defendant Burgos are Time-Barred

With respect to Defendant Burgos, Plaintiff does not allege that she took any acts within the statutory period, i.e., after February 16, 2008.  Moreover, the Court's independent review of the record indicates that the *only* act taken by Burgos after February 16, 2008 was writing a "speedy message" on July 10, 2008 informing command staff that Dr. Shahid ordered Plaintiff to wear a knee brace and not to engage in recreation.  Burgos Aff. ¶ 10 and accompanying exhibit. Even if Plaintiff could establish an ongoing policy of deliberate indifference to his medical needs, Burgos' act of writing a message to command staff was clearly not taken in furtherance of any such policy.  To the contrary, this act reflected Burgos' *concern* for Plaintiff's knee condition; it did not "evince[] a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (internal quotation marks and citation

omitted).   Accordingly, because Burgos did not commit any "wrongful" acts during the statutory

period, Plaintiff's claims as against her are time-barred.[7]

### ii.   The Continuing Violation Doctrine Cannot Revive Plaintiff's Claims Arising from the Acts of Defendants Kistner, Ryan and Orisno Prior to the Statutory Period

Defendants Kistner, Ryan and Orsino argue that the continuing violation doctrine cannot

revive Plaintiff's claims arising from those Defendants' acts prior to the statutory period.  With

respect to Defendant Kistner, although Plaintiff alleges in the TAC that Kistner denied Plaintiff's

2005 Grievance, TAC ¶ 7, the record clearly demonstrates that Kistner was not the Grievance

Coordinator in 2005, and that Lawrence Schott, a non-party, was the Grievance Coordinator who

responded to Plaintiff's 2005 Grievance.  *See* Kistner Aff. ¶ 2; Schott Aff. ¶¶ 2, 6; *see also id.* at

Ex. F.  Accordingly, there are no claims against Defendant Kistner to which the continuing

violation doctrine could apply.

As to Defendants Orsino and Ryan, they argue that the continuing violation doctrine

cannot salvage Plaintiff's claims arising from their actions prior to February 16, 2008.  Plaintiff

alleges—and the record indicates—that during Plaintiff's first incarceration at OCCF, Orsino

denied Plaintiff's appeal of the denial of the 2005 Grievance.  Orsino Aff. ¶ 8; *see id.* at Ex. H.

Plaintiff further alleges that during his second incarceration at OCCF, Orsino denied Plaintiff's

appeal of the denial of the 2008 Grievance.[8]  TAC ¶ 30.  With respect to Defendant Ryan,

Plaintiff alleges—and the record indicates—that during Plaintiff's first incarceration at OCCF in

---

[7] Defendant Burgos also argues that Plaintiff's claims against her are time-barred under the theory that they sound in medical malpractice, which is subject to a two-and-a-half year statute of limitations period.  Burgos' Mem. L. at 2-3. Because the Court finds that Plaintiff's claims against Burgos are time-barred under the three-year statute of limitations period applicable to § 1983 claims, however, it need not address Burgos' argument that Plaintiff's claims sound in negligence.

[8] The Court notes that the record indicates that the appeal of the denial of the 2008 Grievance was denied by Major Thomas Madden, not Defendant Orsino.  Kistner Aff. ¶ 12; *see id.* at Ex. I.

2005, Ryan ordered that Plaintiff's consultation with an outside specialist be rescheduled due to Plaintiff's recent assaults on OCCF staff and his status as a "high escape risk."  Ryan Aff. ¶ 12. Plaintiff further alleges that during his second incarceration at OCCF, Ryan took no action in response to the March 4 and May 13, 2008 recommendations of Dr. Appel that Plaintiff have elective knee surgery, and that he interfered with Plaintiff's treatment by postponing scheduled consultations with the orthopedic specialist.  TAC ¶¶ 34, 43, 47.

The Court finds that Plaintiff cannot rely on the continuing violation doctrine to resuscitate claims related to Ryan's and Orsino's acts in 2005 because the alleged violations were not continuous.  Plaintiff was transferred out of OCCF on May 27, 2005 and did not return until December 18, 2007, over two-and-a-half years later.  Plaintiff has failed to allege that Defendants Orsino and Ryan violated his rights during this approximately two-and-a-half-year period.   "A lack of temporal continuity . . . is 'fatal' to a 'continuing violation' argument." *Barnes v. Pozzi*, No. 10 Civ. 2554 (JGK), 2012 WL 3155073, at *5 (S.D.N.Y. Aug. 3, 2012) (citing *Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 84 (2d Cir.2001) ("Absent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception."); *Everson v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 71, 79 (E.D.N.Y. 2002) ("The acts about which a plaintiff complains must be continuous in time with one another and with the timely acts the plaintiff has alleged for the doctrine to apply . . . ."))).  Moreover, Plaintiff had ample time during this period to file a complaint for violations that occurred in 2005.  *See id.*; *see also Rush v. Fischer*, 923 F. Supp. 2d 545, 553 (S.D.N.Y. 2013).  The record further suggests that Defendant Ryan's and Orsino's acts had a "degree of permanence" to them that should have triggered Plaintiff's "awareness and duty" to assert his rights, as at the time he was transferred out of OCCF on May 27, 2005, he had no expectation of returning to the facility because he had

18

been sentenced to nine years in state custody. *Petrosky v. NYS Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 51 (N.D.N.Y. 1999); *see also* Ryan Aff. ¶¶ 7-8.  Accordingly, the continuing violation doctrine does not apply to toll the statute of limitations for Plaintiff's claims that arose during his first incarceration at OCCF.  Only alleged violations that occurred after February 16, 2008 are actionable.

### V.   Defendants are Entitled to Summary Judgment on Plaintiff's Claims of Deliberate Indifference Arising During his Second Incarceration at OCCF

Plaintiff alleges that Defendants violated his Eighth Amendment rights by delaying surgery on his knee for a nearly five-year period.  TAC ¶ 52.  A review of the record demonstrates that Plaintiff's allegations do not rise to the level of deliberate indifference.

To establish an Eighth Amendment claim arising from inadequate medical care, a prisoner must prove "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  The "deliberate indifference" standard embodies an objective and subjective prong.  To satisfy the objective prong, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).  To be "sufficiently serious," there must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance v. Kelly*, 912 F.2d 605, 602 (2d Cir. 1990) (Pratt, J., dissenting)).  To satisfy the subjective prong, the plaintiff must demonstrate that "the charged official . . . act[ed] with a sufficiently culpable state of mind." *Id.* "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (internal quotation marks

and citation omitted).

Mere disagreements over the quality or course of treatment provided do not state an Eighth Amendment claim. *See Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Troy v. Kuhlmann*, No. 96 Civ. 7190 (BSJ), 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim."). That an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he desired does not evidence a sufficiently culpable state of mind. *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). As long as the medical care is adequate, there is no Eighth Amendment violation. *Id.* Indeed, prison officials and medical officers have wide discretion in treating prisoners, and federal courts are generally hesitant to second-guess medical judgments and to constitutionalize claims which sound in tort law. *Id.* (citation omitted). Thus, the determinations made by medical providers concerning the treatment of patients are given a "presumption of correctness." *Id.* at 312 (internal quotation marks and citation omitted). Moreover, a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation. "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Culp v. Koenigsmann*, No. 99 Civ. 9557 (AJP), 2000 WL 995495, at *7-*8 (S.D.N.Y. July 19, 2000) (quoting *Demata v. NYS Dep't of Correctional Servs.*, No. 99-0066, 198 F.3d 233 (table),

1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)).

Courts in this circuit have consistently found that delays in providing surgery for knee injuries such as the one at issue here are insufficient to support a § 1983 claim for deliberate medical indifference.  For example, in *Espinal v. Coughlin*, No. 98 CIV. 2579 (RPP), 2002 WL 10450 (S.D.N.Y. Jan. 3, 2002), plaintiff, who suffered from a ruptured ACL, alleged that his Eighth Amendment rights were violated because his knee surgery was delayed while he underwent more conservative treatment.  The court found that the plaintiff's condition was not "sufficiently serious" and that the dispute was, at most, a disagreement as to the appropriate course of treatment.  *Id.* at *4-*5.  The court also noted that a ruptured ACL is a common and often chronic knee injury, and one with which many people function without surgical intervention.  *Id.* at *4.  Similarly, in *Culp v. Koenigsmann*, the plaintiff complained of prison officials' alleged delay in authorizing surgery for a torn meniscus in his knee.  2000 WL 995495, at *1.  The evidence in *Culp* suggested that the plaintiff was seen frequently by prison medical staff and by outside consultants; was given x-rays and an MRI, all of which were negative; and was given "conservative" medical treatment—medication, a cane, physical therapy—with repeated follow-up examinations.  *Id.* at *9.  The court held that the plaintiff's allegations reflected a difference in opinion as to his medical treatment rather than any deliberate indifference to his medical needs, and granted summary judgment in favor of the defendants.  *Id.* In so holding, the court compared the plaintiff's claim to the claim in *Demata*.  In that case, the plaintiff incurred a knee injury on February 23, 1994.  1999 WL 753142, at *1.  An MRI was performed in September 1994 and the knee was examined by an orthopedist, who prescribed physical therapy and knee supports.  *Id.*  Additional medical consultations and MRIs culminated in knee surgery in March 1997, three years after the plaintiff's injury.  *Id.*  The Second Circuit

21

affirmed the grant of summary judgment to the defendants and noted that the plaintiff's "mere disagreement with th[e] form of treatment [provided] does not establish deliberate indifference. *Id.* at *3; *see also Sharp v. Jeanty*, No. 93 Civ. 0220 (PNL), 1993 WL 498095 (S.D.N.Y. Nov. 30, 1993) (dismissing § 1983 deliberate indifference claim where plaintiff's medical records indicated an "extensive and ongoing course of medical treatment" of his knee injury and where many of plaintiff's allegations amounted to "second-guessing the treatments of his health care providers"); *Taylor v. Kurtz*, No. 00 Civ. 700F, 2004 WL 2414847 (W.D.N.Y. Oct. 28, 2004) (where plaintiff complained that defendants delayed in providing him knee surgery, granting summary judgment for defendants upon a finding that plaintiff could not meet the "strict requirements for an Eighth Amendment violation" where the record showed that he was treated with pain medication and orthopedic consults prior to the surgery).

Here, Plaintiff claims that Defendants delayed providing knee surgery to repair his torn meniscus and that this delay caused him to suffer increased and unnecessary pain and discomfort.  However, a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation.  In this case, where Plaintiff was given "conservative" medical treatment—medication, a wheelchair, ankle and knee support, and orthopedic consults—his allegations merely demonstrate a disagreement as to the proper course of treatment.  Moreover, Plaintiff has failed to introduce *any* evidence that his knee injury required immediate surgery or that it was "life threatening" or "fast-degenerating."  To the contrary, the evidence submitted suggests that the surgery he desired was "elective," and was therefore not urgent.  In addition, there were times during this purported delay that Plaintiff affirmatively disclaimed treatment and requested to be allowed to engage in recreational activities.  Accordingly, Plaintiff cannot satisfy the objective prong of the deliberate indifference standard.

22

Even if Plaintiff's knee condition was sufficiently serious for Eighth Amendment purposes, he cannot satisfy the subjective standard of deliberate indifference on the part of Defendants.  There is no evidence that Defendants were aware that a substantial risk of serious harm to Plaintiff existed, as the evidence suggests that there was no such risk in any delay in surgery.  Indeed, Dr. Appel, the orthopedic specialist who examined Plaintiff, consistently noted that the surgery was *elective*.  Hanson Aff,. Ex. I.  Additionally, Dr. Appel conditioned the surgery on a finding of "functional instability," but did not make such a finding.  *Id.*  Moreover, during his incarceration at OCCF, Plaintiff's injury was regularly addressed by conservative treatment.  He was routinely seen by the medical staff at the facility, was prescribed pain medication and given ankle and knee support, was ordered to be non-weight bearing and to be transported in a wheelchair, was placed on bed rest, had an MRI and two x-rays of his left knee, and was examined by Dr. Appel on two separate occasions.  The record clearly demonstrates an extensive and ongoing treatment of Plaintiff's injury.  Thus, at most, Plaintiff's allegations reflect a difference in opinion as to his medical treatment, rather than any deliberate indifference to his medical needs.  As stated above, mere disagreement in treatment does not amount to an Eighth Amendment violation.[9]  Moreover, the Court notes that the evidence suggests that Plaintiff's *own* actions may have contributed to the pain he experienced.  Indeed, on several occasions, Plaintiff refused nurse sick call, did not adhere to the orders of bed rest, and did not take the pain medication as prescribed by the doctor.

Accordingly, because Plaintiff has failed to satisfy both the objective and subjective prongs of the deliberate indifferent standard, Defendants are entitled to summary judgment on

---

[9] Because the Court finds that no Eighth Amendment violation occurred, it need not address Defendants' argument that they are entitled to qualified immunity.

Plaintiff's Eighth Amendment claim.[10]

## VI.    Conclusion

For the reasons set forth above, Defendants' motions for summary judgment are GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions and close this case.  (Docs. 131, 136.)

It is SO ORDERED.

Dated:    September 27, 2013
              New York, New York

                                                          _____
                                                          Edgardo Ramos, U.S.D.J.

---

[10] In addition to his Eighth Amendment claim, in the "Conclusion" section of the TAC, Plaintiff alleges violations of his Fourth Amendment rights and his Fourteenth Amendment due process rights.  TAC ¶ 52.  However, the Court finds that all of Plaintiff's allegations relate solely to his Eighth Amendment deliberate indifference claim and fail to state claims under the Fourth or Fourteenth Amendments.  Accordingly, to the extent that Plaintiff brings claims under those Amendments, they are dismissed.